UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JESSE GEORGE COUNTRYMAN,

                Plaintiff,

      v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                Defendant.

**DECISION AND ORDER**

6:15-CV-06131 EAW

## I.    INTRODUCTION

Represented by counsel, Plaintiff Jesse George Countryman ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of Carolyn W. Colvin, Acting Commissioner of Social Security ("the Commissioner"), denying Plaintiff's application for Disability Insurance Benefits ("DIB").   (Dkt. 1). Presently before the Court are the parties' opposing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Dkt. 10, 13). For the reasons set forth below, the Commissioner's motion is granted and Plaintiff's motion is denied.

## II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    Overview

On September 14, 2011, Plaintiff filed a Title II application for DIB. (Administrative Transcript (hereinafter "Tr.") at 148-157).  In his application, Plaintiff alleged that he became disabled as of September 11, 2011, due to chronic obstructive

pulmonary disease (COPD) and emphysema.  (Tr. 150, 166).  Plaintiff's application was denied on February 12, 2012.  (Tr. 74-79).  Plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ").  (Tr. 80-81).  On July 11, 2013, Plaintiff, represented by an attorney, testified at a hearing before ALJ Richard E. Guida.  (Tr. 40-63).  Vocational Expert ("VE") Stephen Schnacke also appeared and testified.  (Tr. 58-63).

On August 22, 2013, the ALJ issued a decision finding Plaintiff not disabled.  (Tr. 20-37).  On January 21, 2015, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6).  Plaintiff commenced this civil action appealing the final decision of the Commissioner on March 10, 2015. (Dkt. 1).

**B.    The Non-Medical Evidence**

Plaintiff was born on October 21, 1960, and was 52 years old at the time of the hearing and the ALJ's decision.  (Tr. 162).  Plaintiff reported that he had an eighth grade education and had attended special education classes, and that he had 17 years of landscaping experience.  (Tr. 166-67).

Plaintiff testified before the ALJ that he had last worked in September 2011 and that he ceased working because of difficulty breathing.  (Tr. 46-48).  Plaintiff told the ALJ that he was smoking at the time he stopped working, but had not smoked in two and a half years.  (Tr. 48-49).  Plaintiff stated that his prior job duties included mowing lawns, trimming shrubs, taking care of buildings, installing faucets, and cleaning gutters.  (Tr. 48).

Plaintiff testified that he gets "short of breath" and that dust, heat, cold, and walking cause him to experience breathing problems. (Tr. 49). According to Plaintiff, he takes medication, including Advair and Spiriva, for his breathing problems, and also has an emergency inhaler. (Tr. 49). Plaintiff further testified that he was being treated by Karen Roth[1] for his breathing issues and that she had advised him to "keep taking the medicine and hope [he] feel[s] better." (Tr. 49). Plaintiff stated that he did not know if Ms. Roth felt he could return to work and that he had not discussed the matter with her. (Tr. 50).

Plaintiff testified that he was right-handed and that he had been experiencing numbness in his hands for three to five years. (Tr. 50). Plaintiff further testified that he had experienced pain in his right shoulder, that an x-ray had revealed that it was "broke," and that the pain traveled down his arm. (Tr. 50-51). Plaintiff stated that he could lift a gallon of milk, but would sometimes have trouble holding even a coffee cup. (Tr. 51). Plaintiff claimed to sometimes have a pain in his shoulder "like somebody stabbed [him]," and stated that he took over-the-counter Aleve for this pain. (Tr. 51).

Plaintiff testified that he had difficulty sitting for more than 20 minutes to a half hour, because his left leg would "go numb." (Tr. 51). Plaintiff further testified that he could stand for between a half an hour and an hour, and then would have to move because his back would "bother" him. (Tr. 51). Plaintiff stated that he had trouble sleeping and typically slept no more than five hours, waking every one to two hours due

---

[1]     Plaintiff referred to Ms. Roth as a "doctor," but the record shows that she is in fact a board-certified adult nurse practitioner ("NP"). Additionally, the transcript of the administrative hearing incorrectly refers to Ms. Roth as "Karen Ross."

to back pain and arm pain.  (Tr. 52).  According to Plaintiff, two to three times per week he naps for two to three hours as a result of his sleeping problems.  (Tr. 52).

Plaintiff testified that he has "GERD" (gastroesophageal reflux disease), and this caused him to have "acid back up" and "real bad heartburn."  (Tr. 53).  Plaintiff stated that he watches what he eats and that he "feel[s] like a rabbit" because he eats a lot of salad.  (Tr. 53).  Plaintiff further testified that in March of 2012, he was suffering from "mini strokes" as a result of high cholesterol, but that his cholesterol was currently "under control."  (Tr. 53).

Plaintiff told the ALJ that he was single and had no children under the age of 18. (Tr. 54).  Plaintiff also stated that he lived with a friend and her parents and that he performed household chores including sweeping, mopping the kitchen, washing dishes, taking out the trash, vacuuming, and doing laundry.  (Tr. 54).  Plaintiff stated that he believed he could do a simple job where he could "get up and sit down multiple times" as long as it was not "dusty."  (Tr. 54-55).  Plaintiff stated that he would need to take "many breaks" and that he might need to lie down while on the job depending on how he was feeling that day.  (Tr. 55-56).  Plaintiff testified that he has a valid driver's license and that he drives with his left hand, but his left hand sometimes goes numb.  (Tr. 55).

### C.   Vocational Expert's Testimony

VE Stephen Schnacke also testified before ALJ Guida.  (Tr. 58-63).  VE Schnacke[2] testified that Plaintiff had worked for 17 years as a landscaper.  (Tr. 58).  The ALJ presented VE Schnacke with a hypothetical question.  (Tr. 59-60).  The VE was

---

[2]   VE Schnacke is sometimes referred to in the record as "Stephen Stepki."

asked to consider someone of Plaintiff's age, education, and work experience who could perform light work, could frequently reach with the dominant upper extremity, and would have to avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation. (Tr. 59). The VE testified that a hypothetical individual with these abilities and restrictions would not be able to perform any of the claimant's past work, but would be able to perform jobs present in the national economy, including an assembler, a hand packer, and a laundry hand folder. (Tr. 59-61). The ALJ then asked VE Schnacke to consider a hypothetical individual with the abilities and restrictions set forth above but who was limited to occasional reaching with the dominant upper extremity. (Tr. 61). The VE testified that such a hypothetical individual would be able to perform the same jobs previously identified. (Tr. 61). The VE further testified that a typical employer will tolerate an employee being absent from work two days per month and that a typical employer gives an employee three breaks during the work day. (Tr. 61). The VE also testified that an employer generally expects employees to remain on-task. (Tr. 62).

The ALJ asked VE Schnacke to consider a third hypothetical individual who had the same abilities and limitations as the first hypothetical individual, but who would exceed the typical employer tolerances of being absent or off-task. (Tr. 62). VE Schnacke testified that there were no jobs available for such an individual. (Tr. 62).

### D.   Summary of the Medical Evidence

The Court assumes the parties' familiarity with the medical record, which is summarized below.

On June 22, 2011, Plaintiff went to the emergency department at Newark-Wayne Hospital ("NWH") complaining of shortness of breath, mid-sternal chest pain, and diaphoresis. (Tr. 301). Plaintiff reported that he had pushed a lawnmower up a hill that day. (*Id.*). Plaintiff's physical examination was essentially normal. (*Id.* at 263). Blood work revealed triglycerides of 186 and HDL (high-density lipoprotein cholesterol) of 34. (*Id.*). Plaintiff was admitted to the hospital and transferred to Rochester General Hospital on June 23, 2011, for cardiac catheterization and angiogram. (*Id.* at 264). Plaintiff's cardiac workup was negative. (*Id.* at 271, 505-519).

Plaintiff returned to the NWH emergency department on June 24, 2011. (Tr. 315). Plaintiff reported intermittent shortness of breath that worsened upon exertion. (*Id.*). Plaintiff reported drinking two to three pots of coffee (roughly 12 cups each) per day. (*Id.*). Physical examination revealed decreased breath sounds in the left and right posterior bases and mild abdominal tenderness. (*Id.* at 316). A chest CT scan was performed and revealed emphysema, especially in the upper lobes bilaterally. (*Id.* at 321). Plaintiff was discharged with instructions on GERD and a prescription for Pepcid. (*Id.* at 317). He was instructed to follow up with his physician within two to three days. (*Id.*).

On June 30, 2011, Plaintiff was seen by nurse practitioner ("NP") Maureen Van Cura at Gananda Family Practice. (Tr. 232). Plaintiff complained chest pain, which NP Van Cura assessed as most likely the result of GERD. (*Id.* at 232-33). NP Van Cura advised Plaintiff to continue Pepcid, avoid irritating foods, decrease his caffeine intake,

and not eat after dinner. (*Id.* at 233). NP Van Cura noted that Plaintiff was to see a gastroenterologist. (*Id.*).

On August 11, 2011, Plaintiff was seen by NP Craig Wiese at the Rochester General Medical Group – Gastroenterology of Newark. (Tr. 271). Plaintiff complained of shortness of breath and upper quadrant abdominal pain. (*Id.*). Physical examination revealed left upper quadrant tenderness to palpitation. (*Id.* at 273). NP Wiese assessed Plaintiff with dyspepsia, dysphasia, and left upper quadrant abdominal pain. (*Id.* at 274). NP Wiese referred Plaintiff for an upper endoscopy, which was performed on August 17, 2011, and revealed hiatal hernia and gastropathy. (*Id.* at 258, 274).

On August 25, 2011, Plaintiff presented to the NWH emergency department complaining of intermittent shortness of breath that worsened with exertion. (Tr. 203). Physical examination revealed faint expiratory wheezing bilaterally. (*Id.*). Plaintiff was treated with Albuterol/Atrovent, assessed with dyspnea, and instructed to follow up with his physician. (*Id.* at 204-05).

On August 26, 2011, Plaintiff was seen by Dr. Lois Van Tol at Gananda Family Practice. (Tr. 236). Dr. Van Tol noted that Plaintiff was following up from his emergency department visit the previous day. (*Id.*). Dr. Van Tol assessed Plaintiff with likely COPD and prescribed a trial of Atrovent and Pro Air. (*Id.*).

On September 9, 2011, Plaintiff was seen at the NWH emergency department. (Tr. 206). Plaintiff complained of intermittent shortness of breath that worsened on exertion. (*Id.*). Plaintiff stated that he had tried his inhaler and it had not helped. (*Id.*).

A physical examination of Plaintiff was unremarkable.  (*Id.* at 206-07).  Plaintiff was assessed with COPD and released.  (*Id.* at 207).

Also on September 9, 2011, Plaintiff was seen by Dr. Van Tol.  (Tr. 238). Plaintiff told Dr. Van Tol about his visit to the emergency department.  (*Id.*).  Dr. Van Tol assessed Plaintiff with recurrent shortness of breath.  (*Id.*).  She increased his dosage of omeprazole and referred him to pulmonology.  (*Id.*).  A pulmonary function test was performed and showed mild obstruction.  (*Id.* at 244).  Plaintiff returned to the NWH emergency department later on September 9, 2011, with continued shortness of breath, nausea, and chest pressure.  (*Id.* at 210).  A physical examination of Plaintiff showed decreased breath sounds and mild abdominal tenderness.  (*Id.* at 210-11).  Plaintiff was assessed with GERD and COPD.  (*Id.* at 212).  He was prescribed prednisone and instructed to take Maalox/Mylanta for two to three nights.  (*Id.*).

On September 11, 2011, Plaintiff returned to the NWH emergency department. (Tr. 216).  Plaintiff complained of nausea, shortness of breath, and chest tightness.  (*Id.*). Physical examination revealed decreased breath sounds throughout and distant tachycardia rhythm.  (*Id.* at 216-17).  Plaintiff was assessed with shortness of breath and COPD.  (*Id.* at 218).  He was instructed to continue his prednisone prescription.  (*Id.*).

On September 13, 2011, Plaintiff was seen by NP Van Cura.  (Tr. 239).  He continued to complain of shortness of breath and chest pain.  (*Id.*).  A pulmonary function test showed normal spirometry and a predicted FEV1 of 80%.  (*Id.* at 243).  NP Van Cura continued Plaintiff on Atrovent, Pro Air, and omeprazole.  (*Id.* at 240).

On September 28, 2011, Plaintiff was seen by pulmonologist Dr. Todd Sheppard. (Tr. 537). Plaintiff reported dyspnea on exertion. (*Id.*). Plaintiff reported being able to climb only one flight of stairs and to walk only a modest distance on flat ground. (*Id.*). Physical examination showed "some very mild decrease in the breath sounds" and was otherwise unremarkable. (*Id.*). A pulmonary function test showed a normal FEV1 and a normal FVC with a slightly decreased ratio. (*Id.*). Dr. Sheppard diagnosed Plaintiff with obstructive lung disease and "possible" emphysema. (*Id.*). He opined that the degree of emphysema seen on the pulmonary function test seemed milder than Plaintiff's systems, but that this could happen to someone with hyperinflation. (*Id.*). Dr. Sheppard added a trial of Spiriva to Plaintiff's treatment and continued Plaintiff on Advair twice daily and albuterol as needed. (*Id.*).

Plaintiff was seen by NP Weise on October 3, 2011. (Tr. 256-57). Plaintiff continued to complain of shortness of breath. (*Id.*). NP Weise assessed Plaintiff with hiatal hernia and gastropathy without pathological findings. (*Id.* at 257). He instructed Plaintiff to continue on omeprazole. (*Id.*).

On October 5, 2011, Plaintiff was seen by Dr. Thuc Huynh at Gananda Family Practice. (Tr. 241). Plaintiff reported continuing to experience shortness of breath on exertion. (*Id.*). Plaintiff's blood pressure was 134/90. (*Id.*). Dr. Huynh assessed plaintiff with COPD/emphysema and GERD. (*Id.*). He continued plaintiff on the management recommended by the specialists. (*Id.*).

On November 8, 2011, Plaintiff again presented to the NWH emergency department. (Tr. 222). Plaintiff had a metal fragment in his eye and reported continuing

- 9 -

to experience shortness of breath after nebulizer treatment. (*Id.*). A small piece of metal was found in Plaintiff's left eye and removed. (*Id.* at 222-23). Plaintiff was assessed with foreign body in eye, corneal abrasion, and COPD exacerbation. (*Id.* at 223). He was instructed to continue using albuterol as needed. (*Id.*).

On January 3, 2012, Plaintiff was treated at the NWH emergency department for bronchitis. (Tr. 502). He was discharged with prescriptions for prednisone, albuterol, and Zithromax. (*Id.* at 502-03).

On January 18, 2012, Plaintiff was seen by Dr. Adriane Trout at Gananda Family Practice. (Tr. 459). Plaintiff reported continuing shortness of breath that worsened with exertion. (*Id.*). Plaintiff also reported a productive cough. (*Id.*). Plaintiff told Dr. Trout that he could not afford his prescribed Advair and/or Spiriva due to lack of insurance and was using only Atrovent and ProAir. (*Id.*). A physical examination was unremarkable. (*Id.*). Dr. Trout prescribed prednisone, to be followed with Avelox if Plaintiff did not feel better within a couple of days. (*Id.*).

On January 20, 2012, Plaintiff underwent a consultative medical examination by Dr. George Sirotenko. (Tr. 427). Dr. Sirotenko's physical examination of Plaintiff showed blood pressure of 130/80, diffuse wheezing that resolved with coughing, and soft rhonchi. (*Id.* at 428-29). Dr. Sirotenko noted that Plaintiff was 5'11" tall and weighed 200 pounds. He assessed Plaintiff's prognosis as "fair" and assessed with a history of COPD/emphysema. (*Id.* at 429). Dr. Sirotenko noted that Plaintiff had residual bronchitis and postponed a pulmonary function test. (*Id.*). Dr. Sirotenko opined that Plaintiff should avoid respiratory triggers that could exacerbate his asthma. (*Id.* at 430).

- 10 -

A note from the Rochester General Medical Group dated February 1, 2012, indicates that Plaintiff had been "taken out of work" on September 21, 2011, and that he needed "disability paperwork" but the pulmonologist was unwilling to fill out a report due to having only seen Plaintiff one time. (Tr. 460). This note further states that Plaintiff needs to follow up with the pulmonologist and "needs to go to [an] independent disability evaluation to have his disability forms filled out." (*Id.*).

On February 10, 2012, non-examining state agency review physician Dr. I. Seok completed a physical residual functional capacity assessment for Plaintiff. (Tr. 431-36). Dr. Seok noted a primary diagnosis of COPD and opined that Plaintiff was able to: occasionally lift and/or carry 20 pounds; frequently lift and/or carry ten pounds; stand and/or walk for about six hours in an eight hour workday; sit for about six hours in an eight hour workday; and engage in unlimited pushing and pulling. (*Id.* at 431-32). Dr. Seok further opined that Plaintiff had no postural limitations, no manipulative limitations, no visual limitations, and should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation due to COPD. (*Id.* at 433-34).

Plaintiff was admitted at NWH from March 17, 2012, to March 20, 2012, due to left side numbness, dizziness, and abdominal pain. (Tr. 492). Plaintiff's physical examination revealed blood pressure of 143/98, few scattered wheezing, and some bilateral horizontal nystagmus on right and left gaze, right greater than left, at cranial nerves 2 through 12. (*Id.* at 497). During Plaintiff's hospitalization, a stress test revealed normal LV systolic function with mild LVH and mild aortic valve sclerosis. (*Id.* at 596).

A CT scan of Plaintiff's abdomen revealed diverticulosis, hyperdense left renal cyst, mild hepatomegaly, and tiny hiatal hernia. (*Id.* at 482-483).

On March 20, 2012, Dr. Eugene Tolomeo conducted a neurological examination of Plaintiff. (Tr. 587-588). Plaintiff told Dr. Tolomeo that his left side had gone completely limp on the night he reported to the emergency department, causing him to fall against a wall. (*Id.* at 587). Dr. Tolomeo opined that Plaintiff's history was consistent with a small vessel transient ischemic attack ("TIA"). (*Id.* at 589). Dr. Tolomeo noted that hypertension and diabetes are risk factors for TIA and ordered a hemoglobin A1C check, blood pressure monitoring, cholesterol control, and antiplatelet therapy. (*Id.*). Plaintiff was diagnosed with TIA, hypercholesterolemia, abdominal pain, and left renal cyst, and was discharged. (*Id.* at 492).

Plaintiff was seen by NP Van Cura on March 23, 2012. (Tr. 461). Plaintiff reported continued transient squeezing chest pain. (*Id.*). Plaintiff's GERD was reportedly stable with omeprazole. (*Id.*). Plaintiff was continued on his medications. (*Id.*).

Plaintiff was seen by Dr. Tolomeo on March 26, 2012. (Tr. 489). Plaintiff's hand weakness had resolved. (*Id.*). Dr. Tolomeo noted that when Plaintiff was admitted to NWH on March 17, 2016, his EKG showed normal sinus rhythm, his carotid ultrasounds were normal, and an MRI of his brain was normal. (*Id.*). Plaintiff's blood pressure was 135/84. (*Id.*). Dr. Tolomeo assessed Plaintiff with cerebral embolism without mention of cerebral infarction and essential hypertension. (*Id.* at 490). He prescribed Lisinopril,

aspirin, and Simvastatin. (*Id.*). Dr. Tolomeo recommended that Dr. Trout replace Simvastatin with Lipitor. (*Id.*).

Plaintiff presented at the NWH emergency department on April 6, 2012, complaining of chest pain. (Tr. 607). Plaintiff was assessed with non-cardiac chest pain. (*Id.* at 609). He was advised to follow up with his primary care physician and to use Tylenol and ibuprofen for chest pain. (*Id.*).

Plaintiff presented at the NWH emergency department on April 10, 2012, complaining of a headache. (Tr. 622). Plaintiff was assessed with atypical chest pain and cephalgia and discharged. (*Id.* at 624).

On May 5, 2012, Plaintiff presented at the NWH emergency department complaining of a sore throat. (Tr. 632). He assessed with pharyngitis and advised to follow up with his physician. (*Id.* at 634).

Plaintiff returned to the NWH emergency department on August 27, 2012, complaining of worsening shoulder pain. (Tr. 641). Plaintiff underwent a right shoulder X-ray which revealed a lesser tuberocity fracture. (*Id.* at 644). He was given a shoulder immobilizer and referred to an orthopedic department. (*Id.*).

Plaintiff was seen by Dr. David Cywinski at Finger Lakes Bone and Joint Center on August 27, 2012. (Tr. 890). Dr. Cywinski assessed Plaintiff with right shoulder rotator cuff tendonitis with impingement. (*Id.*). Dr. Cywinski administered a cortisone injection and ordered a CAT scan of Plaintiff's right shoulder. (*Id.* at 890-91).

Plaintiff was seen at the NWH emergency department on August 30, 2012, complaining of shortness of breath. (Tr. 647). Plaintiff's blood pressure was 139/99 and

- 13 -

physical examination showed rales in Plaintiff's chest, tenderness in the right bicep and right shoulder, and painful range of motion in the left shoulder. (*Id.* at 649). Plaintiff was instructed to follow up with his physician. (*Id.* at 650).

Plaintiff returned to the NWH emergency department on August 31, 2012, complaining of chest pain. (Tr. 653). Plaintiff was treated with aspirin and nitro by emergency medical services and reported that his pain was relieved. (*Id.*). An EKG was performed and revealed sinus tachycardia, left axis deviation, and prolonged QTc interval. (*Id.* at 655).

A CT scan of Plaintiff's right shoulder occurred on September 5, 2012. (Tr. 659-60). The CT scan showed no acute fracture, a well-corticated ossific fragment adjacent to the lesser tuberosity, no destructive osseous legions, narrowing of the posterior aspect of the acromiclavicular joint with associated degenerative changes, a mild amount of calcification in the region of the rotator cuff, and emphysematous changes in the lungs. (*Id.* at 660).

Plaintiff had a follow-up appointment with Dr. Trout on September 6, 2012. (Tr. 835). Plaintiff reported no further shoulder pain. (*Id.*). He asked for help with a disability application, stating that he felt that he was unable to work due to his shortness of breath, chest pain, and musculoskeletal joint pain. (*Id.*). Plaintiff reported low back pain that made him unable to sit or stand for long periods of time, an inability to do repetitive lifting, and bony arthritis pain in both hands. (*Id.*). Physical examination revealed a slight decreased range of motion in the right shoulder, bony osteoarthritis changes in the hands, generalized tenderness and a slightly limited range of motion in the

lumbar spine, and limited ability to walk on heels and tip toes due to pain. (*Id.* at 838). Dr. Trout noted that she agreed that Plaintiff should apply for disability due to the "degree" of his medical issues, but recommended an independent medical examination because she was "not a disability doctor and may not be able to complete forms appropriately for his application." (*Id.* at 839).

Plaintiff presented at the NWH emergency department on September 8, 2012, complaining of dizziness. (Tr. 664). He was assessed with labyrinthitis. (*Id.*). Plaintiff was advised to follow-up with his physician. (*Id.* at 668).

Plaintiff was seen by Dr. Trout on September 18, 2013. (Tr. 848-49). Plaintiff was congested, had blood pressure of 146/100, and had a protuberant abdomen with fluid in his flanks. (*Id.*). Dr. Trout assessed Plaintiff with elevated liver enzymes. Hyperlipidemia, upper respiratory infection, COPD, and hypertension. (*Id.*).

Plaintiff was seen at Finger Lakes Bone and Joint Center on September 25, 2012, to follow up on his shoulder CT scan. (Tr. 893). NP S. Christopher Springer assessed Plaintiff with right shoulder rotator cuff tendinitis with impingement and recommended an MRI of the right shoulder. (*Id.*).

An MRI of Plaintiff's right shoulder was performed on October 2, 2012. (Tr. 703-704). It showed calcific tendinopathy of the supraspinatus, acromioclavicular degenerative changes without inferior spurring, chronic ossification anterior to the glenohumeral joint, mild glenohumeral degenerative changes, and medially subluxed biceps tendon. (*Id.*).

Plaintiff was seen by Dr. David Alexander at the Finger Lakes Bone and Joint Center on October 4, 2012. (Tr. 895). Dr. Alexander noted a "very positive Hawkins sign." (*Id.*). Dr. Alexander assessed Plaintiff with right shoulder calcific tendinitis with subacromal bursitis. (*Id.*). Dr. Alexander noted that "patient is opting for surgery at this point" and had declined continued conservative treatment. (*Id.*).

Plaintiff also saw Dr. Trout on October 4, 2012. (Tr. 859-60). Plaintiff reported having been sick with a worsening cold. (*Id.* at 859). Dr. Trout assessed him with bronchitis and COPD and prescribed azithromycin, Mucinex, and Claritin. (*Id.* at 860).

Plaintiff underwent a preoperative examination by NP Suzanna Weser at NWH on October 23, 2012. (Tr. 718-722). The examination revealed sharp pinpoint tenderness with palpation of anterior aspect of the right shoulder, hesitancy, and decreased range of motion with rotation of the right shoulder posteriorly in circumferential motion. (*Id.*).

On October 24, 2014, Dr. Alexander performed right shoulder diagnosis arthroscopy with extensive fraying and extensive labral debridement and right shoulder arthroscopic subacromial decompression and acromioplasty on Plaintiff. (Tr. 743-44). Plaintiff's pre-operative diagnoses were right shoulder subacromial bursitis with impingement and right shoulder fraying and tearing of the labrum. (*Id.*).

Dr. Cywinski saw Plaintiff on November 2, 2012. (Tr. 901). Plaintiff reported very little pain and an improved range of motion. (*Id.*). Physical examination revealed an excellent range of motion and strength of "5 minus out of 5." (*Id.*).

Plaintiff presented to the NWH emergency department on November 10, 2012, with nasal and sinus congestion, productive cough, fever, and chills. (Tr. 770-71). On

examination, he had a pulse rate of 110, slightly distended abdomen, decreased breath sounds in the right lower field, and faint wheezing. (*Id.* at 774, 776). A chest x-ray was taken and revealed likely atelectasis at both lung bases. (*Id.* at 786). Plaintiff was diagnosed with pneumonia. (*Id.* at 788). He was treated with sodium chloride, Tylenol, Rochephin, and Zithromax, and discharged with a prescription for azithromycin. (*Id.* at 788-790).

Plaintiff had an appointment with Dr. Trout on November 15, 2012. (Tr. 878). Physical examination revealed blood pressure of 132/102 and tenderness with palpitation of the left chest. (*Id.* at 879). Dr. Trout assessed COPD, parainfluenza infection, and hypertension. (*Id.*).

Plaintiff was seen by NP Roth at Newark Internal Medicine on May 8, 2013. (Tr. 883). NP Roth noted that Plaintiff had been transferred from Dr. Trout's service. (*Id.*). NP Roth assessed Plaintiff with hyperlipidemia, shoulder pain, COPD, GERD, hand arthritis, low back pain, chest pain, dyspepsia, dysphagia, constipation, hypertension, history of TIA, emphysema, hematuria, thyroid disease, tobacco abuse, type II or unspecified diabetes mellitus, and vitamin D deficiency. (*Id.* at 884). She prescribed Lipitor. (*Id.* at 887).

After the ALJ rendered his decision, Plaintiff set the following additional medical evidence to the Appeals Council. On August 12, 2013, NP Roth signed a letter stating that Plaintiff was a patient of hers and was disabled by impairments other than drug and/or alcohol abuse. (Tr. 902).

On August 14, 2013, NP Roth completed a multiple impairment questionnaire. (Tr. 911-18). NP Roth noted diagnoses of COPD and hypertension. (*Id.* at 911). She assessed Plaintiff with a "fair" prognosis. (*Id.*). NP Roth failed to fill out the remainder of the questionnaire, instead referring to her attached treatment notes from May 22, 2013. (*Id.*). Those treatment notes showed that on May 22, 2013, Plaintiff had blood pressure of 146/92 and elevated liver function tests. (*Id.* at 904-05). Plaintiff had a normal range of motion and did not complain of any shoulder or arthritis pain. (*Id.* at 905-06). He had wheezes but no rales. (*Id.* at 906). Plaintiff also had elevated triglycerides. (*Id.* at 907).

Plaintiff was seen by NP Roth on September 23, 2013. (Tr. 921). Plaintiff's blood pressure was 128/66. (*Id.*). He complained of low back pain and arthritis. (*Id.*). Plaintiff was walking with a cane. (*Id.*). NP Roth stated that Plaintiff "does have permanent disability and is appropriate for a parking permit for disabilities." (*Id.*). NP Roth assessed a primary diagnosis of arthritis and prescribed guaifenesin. (*Id.* at 923-34).

### E.   Determining Disability Under the Social Security Act and the ALJ's Decision

For DIB, the Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see Rembert v. Colvin*, No. 13-CV-638A, 2014 WL 950141, at *6 (W.D.N.Y. Mar. 11, 2014). A disabling impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are

demonstrable by medically acceptable clinical and laboratory diagnostics techniques."
42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).  The burden is on the claimant to demonstrate
that he is disabled within the meaning of the Act.  *See Draegert v. Barnhart*, 311 F.3d
468, 472 (2d Cir. 2002).  The individual will only be declared disabled if his impairment
is of such severity that he is unable to do his previous work and cannot, considering his
age, education, and work experience, engage in any other kind of substantial gainful
activity.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the ALJ follows a five-step sequential
analysis.  If the ALJ makes a determination of disability at any step, the evaluation will
not continue to the next step.  20 C.F.R. § 416.920(a)(4).  The five steps are as follows:

1.    The Commissioner considers whether the claimant is currently
engaged in substantial gainful activity.

2.    If not, the Commissioner considers whether the claimant has a
"severe impairment" which limits his or her mental or physical ability to do
basic work activities.

3.    If the claimant has a "severe impairment," the Commissioner must
ask whether, based solely on medical evidence, the claimant has an
impairment listed in Appendix 1 of the regulations.  If the claimant has one
of these enumerated impairments, the Commissioner will automatically
consider him disabled, without considering vocational factors such as age,
education, and work experience.

4.    If the impairment is not "listed" in the regulations, the
Commissioner then asks whether, despite the claimant's severe impairment,
he or she has residual functional capacity to perform his or her past work.

5.    If the claimant is unable to perform his or her past work, the
Commissioner then determines whether there is other work which the
claimant could perform.  The Commissioner bears the burden of proof on
this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

In applying the five-step sequential evaluation in this matter, ALJ Guida made the following determinations. At step one, the ALJ found that Plaintiff was not engaged in substantial gainful activity during the relevant timeframe. (Tr. 25-26). At step two, the ALJ determined that Plaintiff had the following severe impairments: COPD, degenerative joint disease, and obesity. (Tr. 25). The ALJ stated that Plaintiff did not meet or equal any listed impairment under step three. (*Id.*). At step four, the ALJ evaluated Plaintiff's residual functional capacity ("RFC") and found that Plaintiff could:

> perform light work as defined in 20 CFR 404.1567(b) with [occasional][3] overhead reaching using the dominant upper extremity. He should avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation.

(Tr. 26). The ALJ also determined at step four that Plaintiff was unable to perform any past relevant work. (Tr. 32). At step five, the ALJ relied on the testimony of the VE to conclude that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including the representative jobs of assembler, hand packer, and laundry hand folder. (*Id.*). The ALJ ultimately concluded that Plaintiff was not disabled or entitled to disability insurance benefits. (Tr. 33).

---

[3]    The ALJ mistakenly stated in his statement of the RFC that Plaintiff was limited to "frequent" overhead reaching with his right arm. (*See* Tr. 26). However, in the remainder of the decision and in his hypothetical questions to the VE, the ALJ was clear that Plaintiff was limited to occasional reaching. (*See, e.g.,* Tr. 31 ("The above RFC . . . limits the claimant to occasional overhead reaching using the dominant upper extremity to reflect the claimant undergoing shoulder surgery for degenerative joint disease.")).

## III.   Discussion

### A.   Standard of Review

This Court has jurisdiction to review the final decision of the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3). "In reviewing a decision of the Commissioner, a court may 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.'" *Rehr v. Barnhart*, 431 F. Supp. 2d 312, 317 (E.D.N.Y. 2006) (quoting 42 U.S.C. § 405(g)). 42 U.S.C. § 405(g) directs the Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record.   Substantial evidence is "more than a mere scintilla," and "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).   It is "a very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 448 (2d Cir. 2012).

The Court also reviews the Commissioner's determination for legal error. "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The scope of the Court's review is limited to determining whether the Commissioner applied the appropriate legal standards in evaluating Plaintiff's claim, and

whether the Commissioner's findings were supported by substantial evidence on the record. *See Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (stating that a reviewing Court does not examine a benefits case *de novo*). If the Court finds no legal error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the plaintiff's position. *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Judgment on the pleadings may be granted under Rule 12(c) where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988).

> **B.     The Appeals Council Adequately Explained its Decision not to Review the ALJ's Decision and the New Evidence did not Render the ALJ's Decision not based on Substantial Evidence**

Plaintiff's first argument is that the Appeals Council erred because it "failed to give any fact-specific reason why ANP-BC Roth's treatment notes and treating opinion did not warrant disturbing the ALJ's opinion." (Dkt. 10-1 at 18). As the Commissioner correctly points out, Plaintiff's argument misapprehends the requirements of the Appeals Council.

The Second Circuit Court of Appeals has explained the role of the Appeals Council as follows:

> A request for Appeals Council review of an ALJ's decision is the fourth and final stage in the administrative process of adjudicating claims for benefits under the Social Security Act. Social Security regulations expressly authorize a claimant to submit new and material evidence to the Appeals Council when requesting review of an ALJ's decision. 20 C.F.R.

§§ 404.970(b), 416.1470(b).  If the new evidence relates to a period before the ALJ's decision, the Appeals Council "shall evaluate the entire record including the new and material evidence submitted . . . [and] then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record." § 404.970(b); *see also* § 416.1470(b).  When the Appeals Council grants review, the decision of the Appeals Council is the final decision of the [Commissioner].  *See* 20 C.F.R. §§ 404.981, 416.1481.  However, if the Appeals Council denies review, the ALJ's decision becomes the [Commissioner's] final decision.  *See* §§ 404.981, 416.1481.  The final decision of the [Commissioner] is subject to judicial review.  42 U.S.C. § 405(g).

*Perez*, 77 F.3d at 44.  In this case, the Appeals Council considered the new evidence submitted by Plaintiff in deciding not to review the ALJ's decision.  (*See* Tr. 1-2, 4-5).  The Appeals Council stated that the record, including the additional evidence, "does not provide a basis for changing the Administrative Law Judge's decision." (Tr. 1-2).

Contrary to Plaintiff's argument, the Appeals Council was not required to articulate a fact-specific reason for its decision to deny review.  *See Perez*, 77 F.3d at 46 ("When the Appeals Council denies review after considering new evidence, we simply review the entire administrative record, which includes the new evidence, and determine, as in every case, whether there is substantial evidence to support the decision of the Secretary."); *Dunning v. Colvin*, No. 12-CV-534S, 2013 WL 2898064, at *3 (W.D.N.Y. June 13, 2013) ("if the Appeals Council grants review of a claim, then the decision that the Council issues is the Commissioner's final decision.  But if, as here, the Council denies the request for review, the ALJ's opinion becomes the final decision.  In the instant case, it is the ALJ's determination that is the final decision of the Commissioner and therefore reviewable pursuant to 42 U.S.C. § 405(g)") (citation and quotation

omitted); *see also Meyer v. Astrue*, 662 F.3d 700, 702 (4th Cir. 2011) ("The Appeals Council need not explain its reasoning when denying review of an ALJ decision"); *Martinez v. Barnhart*, 444 F.3d 1201, 1208 (10th Cir. 2006) ("nothing in the statutes or regulations . . . requires . . . an analysis where new evidence is submitted and the Appeals Council denies review"); *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992) ("the Appeals Council considered the new evidence submitted by [Plaintiff] and then denied review. [Plaintiff] urges us to review that decision on the merits and to conclude that the Appeals Council should have granted review and reversed the ALJ on the basis of her new evidence. However . . . our statutory jurisdiction is confined to review of the 'final decision of the Secretary,' 42 U.S.C. § 405(g). Therefore, we may only review the ALJ's final decision, not the Appeals Council's non-final administrative decision to deny review."); *Damato v. Sullivan*, 945 F.2d 982, 988 (7th Cir. 1991) ("the Appeals Council may deny review of an administrative law judge's decision without articulating its reasons").

Plaintiff further argues that the new evidence submitted to the Appeals Council, which is now part of the administrative record on review, "consistently reflected wheezing, shortness of breath, arthritis and back pain, and uncontrolled hypertension." (Dkt. 10-1 at 20). Plaintiff has failed to persuasively explain how the new evidence submitted to the Appeals Council was inconsistent with the RFC found by the ALJ or with the medical evidence considered by the ALJ. With respect to Plaintiff's contention that the ALJ was unaware of his "uncontrolled hypertension," the most recent treatment notes from NP Roth indicate that Plaintiff's blood pressure was 128/66 without having

taken any medication in four days, and that Plaintiff was going to resume his medication. (Tr. 921, 926).   Plaintiff has also failed to identify any limitation based on his hypertension that is not accounted for in the RFC, which limits him to light work. Moreover, the issues of "wheezing, shortness of breath, arthritis and back pain" (Dkt. 10-1 at 20) were well-documented in the medical record before the ALJ.   Similarly, Plaintiff's contention that the new evidence showed that Plaintiff's COPD had worsened since January 2012 because he had been diagnosed with bronchitis and pneumonia (see *id.*) simply makes no sense.   Plaintiff's diagnoses of bronchitis and pneumonia are not contained in the new evidence and were in fact before the ALJ.

To the extent Plaintiff argues that Dr. Sirotenko's and Dr. Seok's opinions were rendered stale by the new evidence, again, Plaintiff has failed to support this assertion. Although it is true that Dr. Sirotenko's and Dr. Seok's opinions were rendered before Plaintiff complained of shoulder pain and subsequently underwent surgery, nothing in the new evidence submitted to the Appeals Council is directed to this issue.   To the contrary, NP Roth's newly submitted treatment notes from May 22, 2013, expressly note that Plaintiff was not experiencing any shoulder pain. (Tr. 905-06).   The ALJ had the records relating to Plaintiff's shoulder pain, degenerative joint disease, and subsequent surgery before him and expressly discussed these records.   (Tr. 30-31).   Moreover, the ALJ's decision plainly does not rely on the opinions of Dr. Sirotenko and Dr. Seok with respect to Plaintiff's degenerative joint disease or any associated limitations – neither of these physicians opined that Plaintiff had degenerative joint disease, nor did they opine that Plaintiff had any limitations with respect to reaching.   In short, Plaintiff's argument fails

to establish that the new evidence submitted to the Appeals Council was inconsistent with either the medical evidence already in the record or with the ALJ's RFC determination. *See Perez*, 77 F.3d at 47 (decision was supported by substantial evidence where the evidence submitted to the Appeals Council did not contradict the ALJ's findings); *LaRock ex rel. M.K. v. Astrue*, No. 10-CV-1019 NAM VEB, 2011 WL 1882292, at *5 (N.D.N.Y. Apr. 29, 2011), *report and recommendation adopted sub nom. LaRock v. Astrue*, No. 7:10-CV-1019, 2011 WL 1883045 (N.D.N.Y. May 17, 2011) (denying request for remand because "the ALJ's decision remains supported by substantial evidence despite the new evidence submitted directly to the Appeals Council").

**C.     The ALJ's RFC Finding that Plaintiff could Occasionally Reach with his Dominant Arm was based on Substantial Evidence**

Plaintiff's second argument is that the ALJ's determination that Plaintiff could occasionally reach with his right arm was based on bare medical findings and not supported by substantial evidence. (Dkt. 10-1 at 27). Plaintiff's contention is without merit.

The medical evidence in the administrative record, including the new evidence submitted to the Appeals Council, demonstrated that Plaintiff's shoulder pain had essentially resolved following his surgery. On November 2, 2012, after his surgery, Plaintiff reported very little pain and showed an excellent range of motion and strength of "5 minus out of 5". (Tr. 901). Similarly, the notes from Plaintiff's visit to Dr. Trout on November 12, 2012, reflect normal extremities and make no mention of shoulder pain. (Tr. 879). Although Plaintiff reported a history of shoulder pain to NP Roth on May 8,

2013 (Tr. 883), he was not prescribed any pain medication and physical examination revealed only tenderness (Tr. 885, 888). Moreover, by May 22, 2013, Plaintiff had no complaints of shoulder pain and a normal range of motion in both extremities. (Tr. 905-06). NP Roth did not make any mention of shoulder pain in the Multiple Impairment Questionnaire she completed on August 14, 2013, listing only diagnoses of COPD and hypertension. (Tr. 910). On September 23, 2013, Plaintiff had a normal range of motion and no tenderness or edema. (Tr. 922-24). Tellingly, when asked on his application for DIB to "[l]ist all of the physical or mental conditions . . . that limit your ability to work," Plaintiff listed "COPD, emphysema," and made no mention whatsoever of shoulder pain. (Tr. 166).

It is true that the record does not contain a medical opinion specifically addressed to Plaintiff's ability to reach following his surgery. However, "it is not per se error for an ALJ to make the RFC determination absent a medical opinion." *Lewis v. Colvin*, No. 13-CV-1072S, 2014 WL 6609637, at *6 (W.D.N.Y. Nov. 20, 2014). "In addition, the regulatory language provides ample flexibility for the ALJ to consider a broad array of evidence as 'medical opinions.'" *Ross v. Colvin*, No. 14-CV-444S, 2015 WL 4891054, at *5 (W.D.N.Y. Aug. 17, 2015) (quotation omitted). "[W]here the medical evidence shows relatively minor physical impairments, an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment." *Lewis*, 2014 WL 6609637, at *6 (quotation omitted). Additionally, "the Commissioner 'is entitled to rely not only on what the record says, but also on what it does not say.'" *Rouse v. Colvin*,

No. 14-CV-817S, 2015 WL 7431403, at *5 (W.D.N.Y. Nov. 23, 2015) (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983)).

In this case, as discussed above, the record plainly showed that Plaintiff's shoulder pain had largely resolved following his surgery and was a relatively minor impairment. The ALJ did not err in making the common sense judgment that Plaintiff could occasionally reach with his right arm, especially taking into account the lack of any evidence in the record supporting a more restrictive limitation.

## IV.    CONCLUSION

For the foregoing reasons, the Commissioner's determination that Plaintiff was not disabled within the meaning of the Social Security Act is supported by substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings (Dkt. 13) is granted, and Plaintiff's motion for judgment on the pleadings (Dkt. 10) is denied. Plaintiff's complaint is dismissed with prejudice.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:      August 1, 2016
            Rochester, New York